IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 20, 2002 Session

## DAGMAR GABRIELE MOSS v. ALVIN WARREN MOSS

**A Direct Appeal from the Chancery Court for Hardeman County**
**No. 13292 R.D.     The Honorable Dewey C. Whitenton, Chancellor**

_____

**No. W2001-02809-COA-R3-CV - Filed November 19, 2002**

_____

Wife filed a complaint for divorce alleging inappropriate marital conduct and, in the alternative, irreconcilable differences, and husband filed a counterclaim for divorce on the same grounds.  The chancery court awarded the wife an absolute divorce and alimony *in solido* in the amount of $1,000.00, to be paid toward her attorney fees, but denied wife's claim for alimony *in futuro*.  Wife appeals.  We affirm as modified and remand.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed as Modified and Remanded**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and HOLLY KIRBY LILLARD, J., joined.

Harriet S. Thompson, Bolivar, For Appellant, Dagmar Gabriele Moss

H. Morris Denton, Bolivar, For Appellee, Alvin Warren Moss

**OPINION**

Plaintiff-appellant, Dagmar Gabriel Moss ("Wife"), appeals the Final Decree of Divorce of the trial court as to the denial of an award of alimony *in futuro* and the award of only $1,000.00 as alimony *in solido* against defendant-appellee, Alvin Warren Moss ("Husband"), for attorney fees and expenses totaling $1,500.00.

Parties were married on November 25, 1994, after a five month courtship.  In the months leading up to their marriage, the parties lived together in a home owned by Wife.[1]  Upon their union,

_____

[1] At the time of the marriage, Husband owned a separate home which he subsequently deeded to his son, Warren Moss, Jr.  Shortly before trial, Husband purchased real property in his son's name, valued at approximately $25,000.00.  Husband testified that he made a $15,000.00 down payment on this property.

Husband established this home as his permanent residence. Parents of adult children from previous marriages, the parties do not have any offspring together.

On December 20, 2000, Wife filed for divorce after seven years of marriage. As grounds for divorce, Wife alleged that Husband engaged in inappropriate marital conduct. In her testimony at trial, Wife alluded to several instances of inappropriate conduct on Husband's behalf. Specifically, Wife alleged that Husband engaged in multiple extramarital affairs, drank excessively, gave marital property to his son without her consent, refused marriage counseling, moved out of the couple's marital bedroom, and refused to bathe. Husband admitted to drinking heavily on occasion and engaging in sexual relations with other women after his separation, but denied having extramarital affairs while he was living with Wife. Husband also admitted to refusing counseling and failing to bathe.

At the time of the parties divorce, Wife was an unemployed[2], 56 year-old woman with severe health concerns. Her only income was and is derived from social security disability benefits that she has been receiving since October 13, 1994.[3] Currently, Wife receives benefits in the amount of $569.00 a month for complications that she suffers as a result of her "organic brain disorder with a secondary impairment of late effects of cerebrovascular accident," and the disabling effects from the left cerebella stroke she suffered in 1986, and the several minor strokes she has experienced since. As a result of her deteriorating health, Wife is unable to work outside her home.

According to an Affidavit of Income and Expenses submitted by Wife, her monthly living expenses total $1,188.00. Husband admits, and the record indicates, that this amount far exceeds the income she receives from social security disability benefits. In her affidavit, wife listed several general expenses, including utilities, mortgage payments, health and automobile insurance premiums, telephone, cable, and groceries. Aside from these general expenses, Wife also testified to having outstanding medical bills that are not covered by her health insurance, and owing $1,500.00 to her daughter Sheila as repayment for funds advanced to Wife for payment of attorney fees in the case at bar.

Wife's 35 year-old adult son, Thomas McCommon ("McCommon"), resides with Wife in her home. McCommon testified that he has lived with his mother most of his life, and that he lived in the marital home of Wife and Husband for the greater part of the marriage. Wife admitted that McCommon dedicates a portion of his salary from Maytag to the payment of Wife's expenses that exceed her monthly income. Without this assistance, McCommon commented that it would be difficult for his mother to meet her financial obligations.

The underlying theory of Wife's claim for alimony *in futuro* is that she is economically disadvantaged as a result of her disabilities and, because of the substantial non-monetary

---

[2] Prior to her marriage to Husband, Wife was employed in the payroll and personnel department for Master Apparel/Master Slack. As a result of her deteriorating health, and with her husband's urging, Wife quit her job with the factory less than one week after the parties were married. Shortly thereafter, Wife applied for social security disability.

[3] According to the record, Wife also receives approximately $61.00 each month in food stamps.

contributions that she made to the marriage, her former husband, who is in a financially superior condition, should be obligated to pay temporary and permanent support. At trial, Wife specifically requested monthly alimony in the amount of $600.00.

Husband is a 54 year-old, over the road truck driver who currently owns and operates his own trucking business. Husband's business income tax records for the years 1998-2000 were submitted as trial exhibits as proof of his ability to provide spousal support. These records indicate that Husband's annual income from his trucking business for this three-year period was $32,259.00, $43,898.00, and $35,592.00 respectively. Husband's primary business vehicle is a 1993 Freightliner truck that he purchased in December of 1995 while the parties were still married. According to Husband, he applied a $10,000.00 C.D. obtained prior to his marriage to Wife, toward the purchase of the cab. The remainder of the truck balance was paid off during the course of the marriage. The parties agree that the truck has a current depreciated value of $8,000.00.

In addition to the income Husband derives from his trucking business, Wife asserted that Husband is capable of providing spousal support as a result of funds he has accumulated in an individual retirement account ("IRA") and a Woodmen of the World ("Woodmen") fund. The IRA is currently valued at $18,827.00. Wife alleged that marital funds were deposited into these accounts on a monthly basis during the marriage. Although Husband admitted that the accounts were financed through automatic monthly deductions from the couple's joint bank account,[4] he noted that he purchased the IRA and Woodmen fund several years prior to the marriage. Further, Wife admitted that she never contributed any portion of her disability payments or personal funds toward the joint account, the IRA, or the Woodmen fund.[5]

As further support for her argument that Husband is financially able to provide spousal support, Wife asserted that the couple held $10,000.00 in cash savings in a home safe at the time of their separation in July of 2000. According to Wife, Husband took the entire $10,000.00 with him when he moved out of the home. While Husband admitted to taking the money that was in the safe, he disputed the total submitted by Wife in her testimony. In his cross examination testimony, Husband testified that the safe contained $7,500.00 in savings in July of 2000, the balance of which he deposited in a savings account and later used to pay the couple's 2000 income taxes, and purchase tags for his business vehicle.

The record indicates that throughout the course of the parties' seven year marriage, Husband made substantial financial contributions toward the payment of household expenditures, mortgage debts, home improvement, and annual income taxes. Husband paid $12,800.00 on the principal of Wife's home mortgage. In addition to these payments, Husband provided a detailed list in his counterclaim for divorce of improvements to Wife's home that he personally financed over the

---

[4] According to Husband's testimony, Wife was free to write checks out of the joint account.

[5] The chancery court prohibited Wife from testifying about how she spent her disability funds because she was unable to produce any records or bank statements to verify how the money was applied.

course of the marriage.[6] Included among these improvements were the addition of a swimming pool, payment of home and auto insurance premiums, purchase of furniture and yard tools, general home repair expenses, and the purchase of a 1987 Jeep Cherokee for Wife. Husband totaled the improvements at $51,387.00.

Wife argued that regardless of the financial contributions bestowed by Husband, the non-monetary contributions that she made to the marriage warranted an award of temporary and permanent support. In her testimony Wife asserted that she made valuable contributions to the marriage as a wife, homemaker, babysitter, hostess, and helpmate in Husband's trucking business.

Q. Okay, I would like for you to tell the Court everything you did.

A. Well, I kept the house clean, clothes clean, kept the big truck clean. I kept his little truck clean. I went on the road with him. I mowed the yard. I did everything.

Q. Did you do anything specifically with the business besides cleaning the big truck?

A. Yeah, I did his book work and paid the drivers and, you know, when you pay them you got to make quarterly deposits for taxes and stuff.

Q. Did you do those – complete those?

A. Yes.

Q. So you did all the paperwork involved with the business?

A. Yes.

Q. Was there anything else that you did for Mr. Moss in the marriage in the social skills?

A. Well, I straightened up after his friends. I picked up cigarette butts, beer bottles. You name it.

Q. Did Mr. Moss entertain there – entertain friends?

A. It was mostly his family, yes.

---

[6]Although wife does not dispute that these improvements were made, she maintains that these expenditures did not increase the value of her home.

Q. Is there anything else that you did that wasn't a money contribution during the marriage?

A. Well, I kept the pool up, baby-sat Tiffany. He always wanted Tiffany –

Q. Who is Tiffany?

A. His granddaughter. He would get drunk and pass out and I would have Tiffany to play with.

Husband admitted that he often invited friends and family to the house for drinks, and that Wife took care of the cooking, cleaning, yard work, and pool maintenance. Although he admitted that Wife was occasionally asked to act as a hostess to his family and care for his granddaughter, Husband disputed that Wife was burdened with such responsibilities as often as she testified. With regard to his wife's duties in the operation of his trucking business, Husband admitted that Wife was responsible for completing paperwork and bills, and keeping the interior of the truck clean.

Since the couple's separation in July of 2000, Husband has provided temporary support to Wife on several occasions. The record indicates, and wife admitted, that Husband paid her house insurance in November of 2000, bought eyeglasses for Wife at a cost to Husband of more than $200.00, and paid the entire balance of the income taxes owed by the couple for the year 2000. Husband further alleged that Wife withdrew approximately $2,650.00 from the couple's savings account shortly after their separation.

On December 20, 2000, Wife filed a complaint for divorce against Husband on the grounds of inappropriate marital conduct and, in the alternative, irreconcilable differences. Pursuant to her complaint, Wife sought an absolute divorce and "alimony, both temporary and permanent." Wife further prayed for an award of one-half of the equity in Husband's tractor-trailer truck, an equal division of the couple's $10,000.00 cash savings, attorney fees, and court costs. Husband filed a counterclaim for divorce on February 6, 2001, alleging inappropriate marital conduct and irreconcilable differences.

A non-jury trial was held before Chancellor Dewey C. Whitenton, Chancery Court, Hardeman County, Tennessee, on August 21, 2001. The court issued its ruling by written Trial Opinion on September 26, 2002. On October 17, 2001, a Final Decree of Divorce was entered granting Wife an absolute divorce upon the grounds of inappropriate marital conduct. In its order, the court awarded each party the real and personal property presently in their respective possession, but refused to "make any further division of, or cash payment for, marital property." Addressing Wife's claims for temporary and permanent alimony, the court ruled:

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court, after considering all of the applicable factors, including the

duration of the marriage, there shall be no award of any additional alimony in futuro to plaintiff; but since there is a substantial disparity in the income of the parties, the Court does award to the plaintiff, Dagmar Gabriele Moss, the sum of $1,000.00 as alimony in solido to be paid for her attorney, Harriet S. Thompson, as payment on plaintiff's attorney fees.

Wife appealed, presenting the following issues, quoted from her brief, for review.

I. Whether the trial court erred in failing to award alimony *in futuro* to the Wife, Dagmar Moss.

II. Whether the trial court erred in failing to award the entire sum of the Wife's attorney fees as alimony *in solido* to the Wife, Dagmar Moss.

The first issue presented for review is whether the chancery court erred in failing to grant an award of alimony *in futuro* to Wife. Guidelines for the determination of alimony are set forth in T.C.A. § 36-5-101(d) (Supp. 1997). The trial court is afforded wide discretion concerning the award of alimony, and an appellate court should reverse the trial court's findings only in instances in which this discretion "has manifestly been abused." *Hanover v. Hanover*, 775 S.W.2d 612, 617 (Tenn. Ct. App. 1989); *Ford v. Ford*, 952 S.W.2d 824, 827 (Tenn. Ct. App. 1997).

Need and the ability to pay are the critical factors in setting the amount of an alimony award. *Smith v. Smith*, 912 S.W.2d 155, 159 (Tenn. Ct. App. 1995). From the evidence and testimony presented in this case, it is clear that Wife is a woman of limited means and poor health, in desperate need of financial assistance. However, the fact that Wife has demonstrated a need for temporary and permanent support, alone, does not mandate an award of alimony *in futuro* by the chancery court. The court, in analyzing a claim for alimony, must consider and weigh all of the relevant factors set forth in T.C.A. § 36-5-101(d). We find no evidence that the chancellor neglected his duty under this statute.

In his trial opinion, the chancellor offered the following rationale for his decision to deny Wife's claim for alimony.

After consideration of all of the proof and the record in this case, the Court finds by a preponderance of the evidence that the accumulation of equity which Mr. Moss has received in his tractor-trailer truck and IRA account during the marriage is more than offset by the payments that he made on the principal of the mortgage note of the residence and lot of Ms. Moss, and by the improvements that he made to that property.

-6-

We find the chancellor's interpretation convincing, and conclude, simply, that Husband has paid enough. During the span of a seven year marriage, Husband paid at least $12,800.00 on the principal of the mortgage note on Wife's home, contributed over $50,000.00 toward improvements on said home, and was the sole financial provider for the parties. There is uncontroverted evidence that Wife directly benefitted from, and had access to, the income earned by Husband over the course of the marriage. In contrast, the record is devoid of any evidence of any financial contributions made by Wife to the marriage. As a point of fact, Wife was prohibited from testifying about how she spent the disability benefits that she received during the marriage because she failed to produce bank statements or receipts to verify her expenditures.

Irrespective of Husband's financial contributions to the marriage, we find that he is unable to pay temporary or permanent support to Wife based on his limited income and meager personal and real property possessions. Aside from the real property that he purchased shortly before trial, Husband's only significant possession is his 1993 Freightliner truck, currently depreciated to a net value of $8,000.00. Based on these facts, we find that Husband does not enjoy the type of financial stability or prosperity to warrant being saddled with monthly alimony obligations.

Though we cannot dispute that Wife has sincere financial concerns, we find that Wife is in no worse a financial or material position than she was before her marriage to Husband. The disability report submitted on behalf of Wife is evidence that Wife suffered from severe medical complications prior to her marriage to Husband. This report states that Wife was deemed disabled and thereby awarded disability benefits beginning on October 13, 1994. Although she argues that she quit her job with Master Apparel/Master Slack at the urging of Husband, there is no evidence in the record to indicate that Wife was physically capable of maintaining employment. In fact, the record indicates that Wife was experiencing performance difficulties as a result of her disabilities prior to her resignation.

While Wife is unable to provide for her monthly living expenses without assistance, she is not without financial resources. First, Wife receives $659.00 each month in disability benefits and $61.00 in food stamps. Second, Wife maintains possession of the marital home. Finally, Wife testified that her son provides financial assistance to cover any bills or debts that she is unable to satisfy on her fixed income. McCommon, who is employed full-time with Maytag, has lived with his mother for nearly thirty-five years, and lived in the parties' marital home for a substantial term of the marriage. Based on these circumstances, we find that Wife has sufficient financial assistance and resources at her disposal to adequately provide for her necessary living expenses.

While Husband's behavior during the marriage, and Wife's health concerns and non-monetary contributions to the home and business are factors that strongly advocate an award of alimony, we ultimately conclude that Wife is not entitled to an award of alimony *in futuro* when considering the significant benefit she received from Husband's financial contributions to the marriage, and Husband's current inability to provide such support. We therefore affirm the trial court's ruling, and find that he did not commit an abuse of discretion by denying Wife's claim for alimony *in futuro*.

The final issue for review is whether the trial court erred in failing to award Wife the entire sum of her attorney fees as alimony *in solido*. Wife has presented sufficient evidence to demonstrate that she has or will incur at least $1,500.00 in attorney fees for this litigation. However, the court, in its final decree of divorce, awarded Wife only $1,000.00 as alimony *in solido*, with the direction that Wife apply this sum as payment of attorney fees. Wife takes issue with the amount of the alimony *in solido* award, and argues that she is entitled to an award for the full amount of $1,500.00.

The trial court's decision to award attorney's fees is considered an award of alimony. **Long v. Long**, 957 S.W.2d 825, 829 (Tenn. Ct. App. 1997). An appellate court will not interfere with the trial court's decision to award attorney's fees unless it is shown that "manifest injustice would be done if the award is allowed to stand." **Id**.

An award of attorney fees constitutes alimony *in solido*. **Herrera v. Herrera**, 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996); **Cranford v. Cranford**, 772 S.W.2d 48, 52 (Tenn. Ct. App. 1989). As with any alimony award, in deciding whether to award attorneys fees as alimony *in solido*, the trial court should consider the relevant factors enumerated T.C.A. § 36-5-101(d). A spouse with adequate property and income is not entitled to an award of alimony to pay attorney fees and expenses. **Umstot v. Umstot**, 968 S.W.2d 819, 824 (Tenn. Ct. App. 1997); and **Duncan v. Duncan**, 686 S.W.2d 568, 573 (Tenn. Ct. App. 1984). "These awards are appropriate, however, only when the spouse seeking them lacks sufficient funds to pay his or her own legal expenses," **Brown v. Brown**, 913 S.W.2d 163, 170 (Tenn. Ct. App. 1994) (citing **Houghland v. Houghland**, 844 S.W.2d 619, 623 (Tenn. Ct. App. 1992), and **Ingram v. Ingram**, 721 S.W.2d 262, 264 (Tenn. Ct. App. 1986)), or would be required to "deplete his or her resources in order to pay these expenses." **Id**. (citing **Harwell v. Harwell**, 612 S.W.2d 182, 185 (Tenn. Ct. App. 1980)).

Considering Wife's obvious financial concerns and limitations, and no award of alimony *in futuro*, the court's decision to award only $1,000.00 of the attorney fees in the amount of $1,500.00 could be considered an abuse of discretion.

Accordingly, the award of alimony *in solido* is modified to award $1,500.00 for attorney fees. As modified, the decree is affirmed. Costs of the appeal are assessed one-half to Appellant, Dagmar Gabriele Moss, and her surety, and one-half to Appellee, Alvin Warren Moss. The case is remanded to the trial court for such further proceedings as may be necessary.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.